1   STANLEY GOFF (Bar No. 289564)
    LAW OFFICE OF STANLEY GOFF
2   15 Boardman Place Suite 2
    San Francisco, CA 94103
3   Telephone: (415) 571-9570
    Email: scraiggoff@aol.com
4

5   Attorney for Plaintiffs

6                      UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREASURE ISLAND FORMER AND CURRENT RESIDENTS, ANDRE PATTERSON, FELITA SAMPLE, ***Including All Parties Listed and Incorporated Herein;*** and Doe Plaintiffs 1-2,000, on behalf of themselves, and all others similarly situated,<br><br>   Plaintiffs,<br><br>vs.<br><br>TREASURE ISLAND DEVELOPMENTAUTHORITY, et al.<br><br>   Defendants. | Case No. 3:20-cv-1328<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br>**1.Violation of Plaintiffs' Fourteenth Amendment Rights 42 U.S.C §1983;**<br><br>**2. Violation of Plaintiffs' Fourteenth Amendment Rights *Bivens Action;***<br><br>**3. FALSE AND MISLEADING STATEMENTS**<br>**4. NEGLIGENCE FEAR OF CANCER**<br>**5. STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**<br>**6. VIOLATION OF PROPOSITION 65**<br>**7.  PUBLIC NUISANCE**<br>**8. PRIVATE NUISANCE**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiffs FORMER AND CURRENT TREASURE ISLAND RESIDENTS ("PLAINTIFFS"), individually and on behalf of all others similarly situated, demanding a jury trial, bring this action against all named Defendants as well as DOES 1-25; inclusive, for general, consequential, compensatory, punitive, injunctive relief and statutory damages, costs and attorneys' fees resulting from defendants' unconstitutional and tortious conduct.

## I. PARTIES

1. Class Plaintiffs are former and current residents of Treasure Island, consisting of individuals who have been living in, or had substantial contact with, the Treasure Island Community, from 2006 to the present. Plaintiffs also include the following adult and minor Plaintiffs and those Plaintiffs listed and incorporated herein as though fully set forth in this paragraph, plus Doe Plaintiffs 1-2,000:

| | |
|---|---|
| 1.  Andre Patterson | |
| 2.  Felita Sample | |
| 3.  Earnstine Davis | 30.  Andre Patterson III |
| 4.  Steven A. Arnold | 31.  Nicole Walker |
| 5.  Ralph Greene | 32. Lakrista Jackson |
| 6.  Michelle Baker-Greene | 33. Michelle Mathews |
| 7.  Devonaire Lemons | 34. Donna Marie McDaniel |
| 8.  Rarity Lemons | 35. Aaron Medler |
| 9. Leerma Petterson | 36. Shamila Butler |
| 10.  Charles McGee | 37. Bobbie Johnson |
| 11.  Ruth Ann Booker | 38. Camelia Johnson |
| 12. Ayana Arnold | 39. Joseph Spooner |
| 13. Arlando Arnold | 40. Calvin Johnson |
| 14. Terri Johnson | 41. Tramila Butler |
| 15. Kent Davis | 42. Astrid Mills |
| 16. Teresa Johnson | |
| 17. Lailonnie Arnold | 43. Charles Patterson |
| 18.  Victor Wilson | 44. Dreyana Patterson |
| 19. Ronald L. Johnson | 45. Vancois Wilson |
| 20. Johnathan Johnson | |
| 21. Flint Collins | |

2

22. Peter Boutte
23. Otis Broughton
24. Stanley Daglow
25. Arthur Glen Ayers
26. Alfonzo B. Williams
27. Donald Johson
28. Tracy Marks
29. Vancois D. Amoun

**DOE PLAINTIFFS**

2. DOE PLAINTIFFS 1-2,000 are former or current residents of TREASURE ISLAND, consisting of individuals who have been living in, or had substantial contact with, the Treasure Island Community, from 2004 to the present but have not to date discovered the elements of their causes of action. This action will be amended to include those DOE PLAINTIFFS 1-2,000 when those PLAINTIFFS have ascertained and discovered each element of each cause of action against each of the named DEFENDANTS herein.

3. DEFENDANTS Tetra Tech, Inc. and Tetra Tech EC, Inc. is a California corporation that has contracted with the United States Navy to perform clean-up and remediation services on Treasure Island in San Francisco.

4. DEFENDANTS Shaw Environmental, Inc. is a California corporation that has contracted with the United States Navy to perform clean-up and remediation services on Treasure Island in San Francisco.

5. TREASURE ISLAND DEVELOPMENT AUTHORITY, is a California entity under the municipality of the City of San Francisco. Defendant Robert Beck is and was employed by the San Francisco Treasure Island Development Authority during all times relevant to this civil action. Defendant Bob Beck acted under the color of law as it pertains to this complaint and he is being sued in his individual capacity.

6. DEFENANT U.S. NAVY TREASURE ISLAND CLEAN UP LEAD PROJECT MANAGER DAVID CLARK, was employed by the United States Navy at all times relative to this complaint. This individual is being sued in his *individual capacity* and acted under color of federal law.

7. DEFENDANT U.S. NAVY ENVIRONMENTAL COORDINATOR KEITH FORMAN, was employed by the United States Navy at all times relative to this complaint. This individual is being sued in his *individual capacity* and acted under color of federal law.

8. CALIFORNIA DEPARTMENT OF PUBLIC HEALTH is a California entity under the authority of the state of California. Defendant Anthony Chu is and was employed by the California Department of Public Health during all times relevant to this civil action. Defendant Chu acted under the color of law as it pertains to this complaint and is being sued in his individual capacity.

9. SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH is an entity under the authority of the City and County of San Francisco and Defendant Amy Brownell is and was employed by the San Francisco Department of Public Health during all times relevant to this civil action. Defendant Brownell acted under the color of law as it pertains to this complaint and she is being sued in her individual capacity.

**DOE DEFENDANTS**

10. The true names and capacities, whether individual, corporate, associate, subsidiary, officer, director, employee, other representative, or otherwise, of DOE DEFENDANTS 1 through 25 inclusive, are unknown to the PLAINTIFFS, who therefore sue each DEFENDANT by a fictitious name. PLAINTIFFS are informed and believe and thereupon allege that each of

these fictitiously named DEFENDANTS are responsible, in some manner, for the damages alleged herein. PLAINTIFFS therefore designate DOE DEFENDANTS 1 through 50 by such fictitious names, and when their names have been ascertained, PLAINTIFFS will amend this complaint to allege their true names and capacities.

## II. JURISDICTION AND VENUE

11. This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 and 12132 and the Fourteenth Amendment to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a). This Court has further jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 as those claims form part of the same case and controversy under Article III of the United States Constitution.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in the San Francisco County, which is located in this district.

## IV. RESPONDEAT SUPERIOR

13. Regarding all state law claims, all of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of DEFENDANTS. Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified, endorsed, and agreed to the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment, agreement, and ratification.

## V. STATEMENT OF FACTS

14. Treasure Island is a deactivated U.S. Naval Base located in San Francisco, California, adjacent to San Francisco Bay.

15. In 1988, the Environmental Protection Agency (EPA) evaluated Treasure Island as qualifying as Superfund Site. However, the EPA did not put Treasure Island on the Natural Priorities List as a superfund site because the Navy and the State of California had already started the clean-up process. At that time, no one lived on Treasure Island.

16. By 1997, the Navy entered into agreements with the City and County of San Francisco to turn over the Island for civilians to reside on it.

17. The goal then was to grow the island's population from 2,000 to 19,000 with the development of high rises and infrastructure across the old base, which was projected to cost $1.5 billion.

18. Since the EPA review over thirty years ago, San Francisco, has placed thousands of low-income families onto Treasure Island, exposing them to significantly dangerous levels of chemical and radiative contamination.

19. Soil at the site was and still is contaminated with radioactive waste, with nuclear byproducts on the island that were "higher than [the] Navy disclosed.

20. The US Navy had not properly assessed the levels of cesium-137, a fission byproduct, in soil samples dating back to the 1970s. In reality, contamination levels are some three times higher than the Navy reported, and 60 percent higher than the Navy's own safety guidelines.

21. A 2006 survey by the Navy found that while problems occasionally happened, nuclear activities at the Treasure Island base were closely regulated and frequently inspected. However, this 2006 report intentionally ignored decades of audits that found poor safety procedures for radiation and toxic removal at the island.

22. The Navy chose not to revise its 2006 Historical Radiological Assessment (HRA) survey to incorporate the new knowledge and instead, military officials continued to proceed as though the 2006 report were accurate, not updating it until 2012.

23.  In 2008, Shaw Environmental Contractor Robert McLean discovered and reported highly radioactive waste under the foundation of the Treasure Island residences. McLean and other contractors were ordered by Shaw Environmental management to stop scanning the residential foundations for radioactivity and reporting on these findings. In fact, as recent as September 2019, a basketball size amount of radioactive waste was discovered under the front step of someone's home on Treasure Island.

24. For years, workers at Treasure Island have reported fraud in the clean-up at treasure island. Workers were ordered by Shaw Environmental management and Tetra Tech not to scan areas for radio activity, but to report that the areas had been scanned and cleared.

25. Construction workers have dug up and removed soil from Treasure Island but at the orders of Shaw and Tetra Tech, this soil was never scanned and there were fake reports authored to indicate that the soil had been scanned and cleared.

26. The 2012 HRA was submitted to the California Department of Public Health who intentionally chose to approve the report without any review. The 2014 HRA was also approved by the California Department of Public Health without any review.

7

27. The California Department of Public Health has intentionally not tested the soil provided by Treasure Island for years or verified the work of the contractors and have failed to have confirming soil samples from Treasure Island tested all while intentionally conveying to residents and the public that Treasure Island is safe.

28. For years, the Plaintiffs in this suit have asked at numerous hearings about the safety of Treasure Island, and Navy Representatives David Clark and Kith Forman and TIDA's Robert Beck and San Francisco Department of Public Health Amy Brownell have all fraudulently assured the Plaintiffs and the public at large that Treasure Island is safe.

29. At least 10 times in the last eight years, in hearings and documents and emails, Defendant Amy Brownell has touted a helicopter search for radioactive "hot spots" performed in 2012 as evidence that Treasure Island is safe. The helicopter, equipped with a radiation scanner, flew above Treasure Island at the midspan of the Bay Bridge. The aerial scan detected nothing out of the ordinary.

30. However, Defendant Amy Brownell understood from the beginning that the helicopter was unlikely to find radioactive hazards because it was not as sensitive as ground-level scans and soil tests.

31. Pursuant to a public records request, a San Francisco Chronicle investigation found that in 2012, before the helicopter scan was performed, Amy Brownell, told two city development officials through e-mail that the helicopter would probably fail to locate hazards at Treasure Island. In the email, Brownell wrote that the helicopter's limitations were among several "reasons to request" a flyover of the former base. "Extremely unlikely that they will find anything," Brownell wrote on August 19, 2012, "because they are just doing a gamma survey at

8

300 feet — the instruments and lab tests that Navy does on the surface at HPS (Hunters Point Shipyard) are much more sensitive."

32. The helicopter, operated by the U.S. Department of Energy, was designed to fly 300 feet above the ground and quickly scan wide areas for radiation during nuclear emergencies, according to federal descriptions of the aircraft. It was meant to measure the extent of radiation leakage after a power plant meltdown or to search for "dirty bombs." It wasn't built for the more subtle work of spotting patches of poisoned soil or small, buried radioactive objects, and it wasn't normally used for that purpose.

33. In summer 2012, the U.S. government announced it would fly the helicopter above some parts of the Bay Area as part of a research project to study background radiation levels. The flight, ordered by the Department of Homeland Security, wasn't part of any environmental or cleanup project and, originally, the government did not intend to fly above Hunters Point and Treasure Island.

34. In the August 2012 email in which she said the survey was "extremely unlikely" to find anything, Defendant Brownell suggested a clean bill of health from the helicopter would help the city's efforts to develop the old military bases for housing. Officials had been pushing for years to take control of Navy-owned land at the sites."If they don't find anything," Brownell wrote, "it will be another layer of evidence to add to all our other information that provides assurance that the property transfers are safe."

9

35. Two days after she sent the email, the city officially requested that the federal government include Hunters Point and Treasure Island in the helicopter's search area "as special areas of interest," records show. The federal government agreed, and the scan was completed over a five-day period in late August, covering 69 square miles of the Bay Area, including the former naval bases.

36. As planned by Defendant Amy Brownell, the helicopter found no radioactive anomalies at Point or Treasure Island. And in the years since, despite acknowledging the helicopter's limitations in private, Brownell and the health department have promoted the helicopter's results to speed the real estate development of Hunters Point and Treasure Island, according to documents obtained by the San Francisco Chronicle.

37. The San Francisco through Defendant Brownell has used the findings to dismiss questions about contamination, to argue against new searches for radioactive waste and to persuade elected officials, regulators and residents that Hunters Point and Treasure Island have been properly vetted. The health department through Defendant Brownell did so in testimony before the Board of Supervisors, in a meeting with residents, in memos listing talking points, and in emails to prospective home buyers and city consultants.

38. On Sept. 18, 2012, just weeks after the flyover, the Navy held a community meeting on Treasure Island about the status of the cleanup there. Tensions were high: Residents spoke at the meeting, saying they worried about the health of their families and didn't believe the Navy and the city were telling the truth about the extent of contamination. Defendant Brownell spoke and mentioned the helicopter. She suggested residents could trust the aerial survey — and the negative results it produced — because it was done by Homeland Security, an agency with no

relationship to the development project. The helicopter survey "was totally independent," Brownell told the residents, according to a transcript of the meeting. "They did a survey in a helicopter with radiation detectors at about 300 feet, and they literally flew back and forth from across Treasure Island and several other spots in San Francisco. They're doing it as part of a research project to understand background levels."

39. She added that the survey results were "part of our weighted evidence that there are no concerns on this Island," because "there were no concerns found and no anomalies or anything that they didn't know about ... a completely different agency said that, yes, we've scanned the island, and there's not any problem."

40. In 2012 and early 2013, records show, Brownell continued to use the helicopter to dismiss concerns, even as other public officials worried about risks to residents on Treasure Island and suggested the island be scanned more carefully.

41. On Oct. 15, 2012, Treasure Island residents packed into a Board of Supervisors hearing and asked that all of the island's residential areas be tested. Then-Supervisors Jane Kim and David Campos said it was a reasonable demand. "It is something that if I lived there, that I would like to see my government do," Campos said, to applause from the residents. "I would rather err on the side of doing more than less." Brownell, who testified at the hearing, responded, "We can certainly explore that idea."

42. But the day after the hearing, Brownell used the helicopter survey to argue against more testing in an email to a city redevelopment official. "Before we ask CDPH (the California Department of Public Health) to scan more — let's talk," she wrote. "I think we can use the aerial survey to help out with this issue."

43. In emails over the next several months, Brownell continued to make the case that the helicopter scan "supports conclusions that the whole island is safe." In a March 2013 email to a city redevelopment official and a city consultant, she said, "I'm convinced that we can be assured that there is nothing of concern for the population as a whole on TI Treasure Island] ... the aerial survey gives us that assurance."

44. That month, technicians with the state health department collected soil samples at five locations in the island's common areas where radiation measurements were "significantly" elevated. At one of these spots, they unearthed an octagonal disc found at a shallow depth in the soil about 20 feet from a bus stop. The object emitted enough radiation to "cause radiation burns, hair loss and possible ulceration" if held against the skin for an hour, according to a 2013 state report.

45. After that finding and other earlier discoveries of contamination, the Navy decided that the island's large housing area known as Site 12 was "radiologically impacted" and must be investigated. Since then, Navy contractors have found more than 700 radioactive objects in Site 12, most in old landfills and some near occupied homes, parks and playgrounds. Most were contaminated with radium-226, an isotope linked to blood disorders and a range of cancers. The helicopter study had failed to identify all 700-plus objects.

46. It is alleged based on information and belief that DEFENDANTS Tetra Tech, Inc. and Tetra Tech EC, Inc. were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that this Defendant conducted fake sampling tests to mislead the Plaintiffs and the general public into believing that

12

the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological cleanup of the soil. That contractors discovered and reported the existence of highly radioactive waste under the foundation of Treasure Island residences, and that these contractors were ordered by Tetra Tech management to stop scanning the residential foundations for radioactivity and reporting on these findings, but to report that the areas had been scanned and cleared.

47. That construction workers have dug up and removed soil from Treasure Island but at the orders of Tetra Tech management, this soil was never scanned and there were fake reports authored to indicate that the soil had been scanned and cleared.

48. It is alleged based on information and belief that DEFENDANTS Shaw Environmental, Inc. were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant and that this Defendant intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that this Defendant conducted fake sampling tests to mislead the Plaintiffs into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil.

49. That contractors discovered and reported the existence of highly radioactive waste under the foundation of Treasure Island residences, and that these contractors were ordered by Shaw Environmental management to stop scanning the residential foundations for radioactivity and reporting on these findings, but to report that the areas had been scanned and cleared.

13

50. That construction workers have dug up and removed soil from Treasure Island but at the orders of Shaw Environmental management, this soil was never scanned and there were fake reports authored to indicate that the soil had been scanned and cleared.

51. It is alleged based on information and belief that DEFENDANT Robert Beck of the TREASURE ISLAND DEVELOPMENT AUTHORITY, was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant chose not to disclose this information to the Plaintiffs. It is further alleged that for years, in hearings Defendant Beck has touted that Treasure Island is safe, with full knowledge that Treasure Island was contaminated and intentionally induced Plaintiffs to participate in their self-exposure to dangerous levels of radiation on a superfund site through canard and deception.

52. It is alleged based on information and belief that DEFENANT U.S. NAVY TREASURE ISLAND CLEAN UP LEAD PROJECT MANAGER DAVID CLARK, was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant intentionally chose not to disclose this information to the Plaintiffs, despite having a duty to do so. It is further alleged that for years, in hearings Defendant Clark has touted that Treasure Island is safe, with full knowledge that Treasure Island was contaminated and intentionally induced Plaintiffs to participate in their self-exposure to dangerous levels of radiation on a superfund site through canard and deception.

53. It is alleged based on information and belief that DEFENDANT U.S. NAVY REPRESENTATIVE KEITH FORMAN, was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant intentionally chose not to disclose this information to the Plaintiffs, despite having a duty to do

so. It is further alleged that for years, in hearings Defendant Forman has touted that Treasure Island is safe, with full knowledge that Treasure Island was dangerously contaminated and intentionally induced Plaintiffs to participate in their self-exposure to dangerous levels of radiation on a superfund site through canard and deception.

54. It is alleged based on information and belief that Defendant Anthony Chu of the California Department of Public Health was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant also chose not to disclose this information to the Plaintiffs. It is further alleged that for years, in hearings Defendant Chu has touted that Treasure Island is safe, with full knowledge that Treasure Island was contaminated and intentionally induced Plaintiffs to participate in their self-exposure to dangerous levels of radiation on a superfund site through canard and deception.

55. It is alleged based on information and belief that Defendant Amy Brownell of the San Francisco Department of Public Health was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant also chose not to disclose this information to the Plaintiffs. It is further alleged that for years, in hearings and documents and emails, Defendant Amy Brownell has touted a helicopter search for radioactive "hot spots" performed in 2012 that she helped orchestrate as evidence that Treasure Island is safe, with full knowledge that this study was wholly inadequate in determining whether Treasure Island was contaminated and the extent of its contamination.

56. That Amy Brownell intentionally invoked the helicopter study that was not designed to find the contamination on Treasure Island, then used this intentionally inadequate study to say that there was no contamination on Treasure Island.

57. That Amy Brownell intentionally induced Plaintiffs to participate in their self-exposure to dangerous levels of radiation on a superfund site through canard and deception.

## VII. CLASS ACTION ALLEGATIONS

58. PLAINTIFFS bring this lawsuit as a class action and on behalf of themselves and all others who are similarly situated. The class is composed of all persons who WERE RESIDENTS OR ARE RESIDENTS OF TREASURE ISLAND, consisting of individuals who have been living, working, attending school or had substantial contact with the community from 2006 to present.

59. The members of the class are so numerous, approximately 2,000 residents, that joining them all individually would be impracticable. PLAINTIFFS don't know the exact number of the members of the class at this time, but the number and identity of the class members is easily ascertainable through DEFENDANTS' business records.

60. PLAINTIFFS have the same interest in this matter as all other members of the class.

61. PLAINTIFFS' claims are typical of all the members of the class.

62. A well-defined community of interest in the questions of law and fact involving all members of the class exists.

63. Common questions of law and fact predominate over questions that may affect only individual class members.

**Questions of Law:**

1. The nature and application of DEFENDANTS' statutory and common law duties to avoid unfair and fraudulent business practices;

16

2.  The nature and application of DEFENDANTS' statutory and common law duties to avoid false and misleading communications about the remediation of radiation and toxins on Treasure Island, which is causing harm, fear, mental and emotional distress to all PLAINTIFFS;

3.  The nature and application of the DEFENDANTS' duties with respect to the operation, management and supervision of the soil remediation and clean-up operation of Treasure Island;

4.  DEFENDANTS' applicable standard of care with respect to the operation, management and supervision of the remediation of radiation and clean-up operation of Treasure Island.

5.  DEFENDANTS' violation of Plaintiffs' constitutional rights under the Fourteenth Amendment.

**Common Questions of Fact:**

1.  Did DEFENDANTS breach their statutory and common law duties to avoid false and misleading communications about the soil remediation and clean- up operation of Treasure Island?

2.  Did DEFENDANTS breach their duties with respect to the operations, management and supervision of the soil remediation and clean-up operation of Treasure Island?

3.  Did DEFENDANTS' violate the Plaintiffs' constitutional rights under the Fourteenth Amendment.

17

64. PLAINTIFFS' claims are typical of all class member claims because all class members' claims arise from DEFENDANTS' failure to disclose to the Plaintiffs and to the public about the levels or radioactive materials and other toxins located in the soil of Treasure Island.

65. The evidence and the legal issues regarding the DEFENDANTS' wrongful conduct are substantially identical for PLAINTIFFS and all of the class members.

66. DEFENDANTS have acted or failed to act on grounds generally applicable to all class members, making equitable relief—e.g., restitution to each class member—appropriate to the class as a whole.

67. The court should certify the class because common questions of law and fact predominate over individual questions. Legal issues regarding duty and standard of care are common to all class members' claims. Factual issues regarding breach and the measure of restitution are common to all class members' claims.

68. A class action is superior to all other available procedures for the fair and efficient adjudication of these claims. Even if any individual class member could afford individual litigation, it would be unduly burdensome to the courts in which the separate lawsuits would proceed. A single class action is preferable to separate, individual lawsuits because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

**REPRESENTATIVE PLAINTIFFS ANDRE PATTERSON** and **FELITA SAMPLE**

69. Are both educated, articulate, professionals who will fairly and adequately protect the interests of the members of the class.

70. PLAINTIFFS do not have interests that are contrary to or in conflict with those of the members of the class they seek to represent. PLAINTIFFS' undersigned counsel is experienced and capable of managing a class action of this anticipated size and complexity and will vigorously prosecute the class claims.

71. The prosecution of separate, individual lawsuits by individual members of the class would create a risk of inconsistent or contradictory findings of fact and law—which could impose incompatible standards of conduct for DEFENDANTS—and would lead to repetitious trials of the numerous common questions of fact and law.

72. PLAINTIFFS know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of these claims.

73. Class members may be identified and notified of developments in this class action through state or nationwide publications.

74. PLAINTIFFS and class members have suffered financial losses and irreparable harm as a result of DEFENDANTS' wrongful conduct. Without a class action, PLAINTIFFS and members of the class will continue to suffer losses, thereby allowing DEFENDANTS' wrongful conduct to proceed without remedy.

**FIRST CAUSE OF ACTION**
**Violation of Plaintiffs' Fourteenth Amendment Rights 42 U.S.C §1983**
**Violation of Bodily Integrity as to Defendants Amy Brownell, Robert Beck, Anthony Chu and DOES**

75. Plaintiff incorporates herein by reference the preceding paragraphs 1-74 of this complaint as though fully set forth herein and alleges as follows:

76. That Plaintiffs' have a right to bodily integrity, an indispensable right recognized at common law as the right to be free from unjustified intrusions on personal security and encompassing freedom from bodily restraint and punishment.

77. That the forcible exposure to radiation and toxic chemicals to the Plaintiffs' bodies represents a substantial interference with their liberty.

78. That Amy Brownell involuntarily subjected the Plaintiffs without their consent to radiation and toxic chemical exposure with no known therapeutic value under false pretenses and with deceptive practices hiding the nature of the interference.

79. That Defendant Amy Brownell was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant also chose not to disclose this information to the Plaintiffs.

80. That for years, in hearings and documents and emails, Defendant Amy Brownell touted a helicopter search for radioactive "hot spots" performed in 2012 that she helped orchestrate as evidence that Treasure Island is safe, with full knowledge that this study was inadequate in determining whether Treasure Island was contaminated and the extent of its contamination and these efforts by Amy Brownell were made with the intent to deceive the

Plaintiffs and the public into believing that Treasure Island was safe to inhabit when it was in fact not safe.

81. That San Francisco did not have a legitimate government interest regarding this Defendant's conduct.

**Robert Beck**

82. That Robert Beck involuntarily subjected the Plaintiffs without their consent to significantly dangerous levels of radiation and toxic chemical exposure with no known therapeutic value under false pretenses and with deceptive practices hiding the nature of this interference with their bodies.

83. That Defendant Robert Beck was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant also chose not to disclose this information to the Plaintiffs.

84. That this Defendant helped orchestrate evidence that the radiation levels and chemical toxins on Treasure Island were safe to live around, with full knowledge that Treasure Island was not safe to inhabit with the intent to deceive the Plaintiffs and the public into believing that Treasure Island was safe.

85. That San Francisco did not have a legitimate government interest regarding this Defendant's conduct.

*Monell Claim against San Francisco*

86. Through the conduct of Amy Brownell of the San Francisco Department of Public Health and Robert Beck of the Treasure Island Development Authority, Defendant SAN FRANCISCO deprived Plaintiffs of their rights, privileges, and immunities secured by the United States Constitution.

87. That over the last 15 years, SAN FRANCISCO has had a widespread or longstanding custom and practice of allowing its employees such as Defendant Amy Brownell and Robert Beck who were both aware that the levels of radiation on Treasure Island were significantly higher and more dangerous than the Navy disclosed to the public, to attend countless public hearings, such as Board of Supervisor hearings, RAB (Restoration Advisory Board) meetings etc.. where they both provided intentionally misleading and false data that Treasure Island was safe for human habitation, with full knowledge that this data was inadequate and false with the intent to deceive the Plaintiffs and the public into believing that Treasure Island was safe to inhabit so that the City's expansion of housing on Treasure Island could move forward unimpeded.

88. That this widespread and longstanding practice amounts to deliberate indifference towards the constitutional rights of the Plaintiffs.

89. As a direct result of the named DEFENDANT SAN FRANCISCO actions and inactions, Plaintiffs' constitutional rights were violated, resulting in Plaintiff's injuries.

90. The conduct of Defendants as alleged, was done in conscious disregard of Plaintiffs' rights and safety and thus constitutes malice.

91. Because the above acts were performed in a malicious, and/or oppressive manner, Plaintiff is entitled to recover punitive damages from Defendants in an amount according to proof.

*Anthony Chu*

92. That Anthony Chu involuntarily subjected the Plaintiffs without their consent to radiation and toxic chemical exposure with no known therapeutic value under false pretenses and with deceptive practices hiding the nature of this interference with their bodies.

93. That Defendant Anthony Chu was aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that this Defendant also chose not to disclose this information to the Plaintiffs.

94. That this Defendant helped orchestrate evidence that the radiation levels and chemical toxins on Treasure Island were safe to live around, with full knowledge that Treasure Island was not safe to inhabit with the intent to deceive the Plaintiffs and the public into believing that Treasure Island was safe.

95. That the California Department of Public Health did not have a legitimate government interest regarding this Defendant's conduct.

**Violation of Plaintiffs' Fourteenth Amendment Rights *Bivens Action***
**Violation of Bodily Integrity as to Defendants Keith Forman and David Clark**

96. That Defendants Keith Forman and David Clark involuntarily subjected the Plaintiffs without their consent to significantly dangerous levels of radiation and toxic chemical exposure with no known therapeutic value under false pretenses and with deceptive practices hiding the nature of this interference with their bodies.

97. That Defendants were aware that the true levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants chose not to disclose this information to the Plaintiffs.

98. That these Defendants helped orchestrate evidence that the radiation levels and chemical toxins on Treasure Island were safe to live around, with full knowledge that Treasure Island was not safe to inhabit with the intent to deceive the Plaintiffs and the public into believing that Treasure Island was safe.

99. That the United States did not have a legitimate government interest regarding the Defendants' conduct.

24

## *State Claims*

**(FALSE AND MISLEADING STATEMENTS)**
**(Against SHAW ENVIRONMENTAL, DAVID CLARK, KEITH FORMAN, TETRA TECH EC, INC. and DOES 1-100)**

100. PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs 1-99, as though fully set forth herein.

101. All named DEFENDANTS' wrongful conduct constitutes unfair and fraudulent business practices that have in fact deceived PLAINTIFFS and class members in violation of California Business & Professions Code § 17500.

102. DEFENDANTS **DAVID CLARK and KEITH FORMAN** made untrue and misleading statements to the Plaintiffs about the implementation, execution, disposition, discharge, clean-up, and remediation of radiation and toxins at Treasure Island.

103. DEFENDANTS **TETRA TECH EC, INC.** made untrue and misleading statements to the Plaintiffs about the implementation, execution, disposition, discharge, clean-up, and remediation of radiation and toxins at Treasure Island. That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted fake sampling tests to mislead the Plaintiffs and the public into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

104. DEFENDANTS **SHAW ENVIRONMENTAL INC** made untrue and misleading statements to the Plaintiffs about the implementation, execution, disposition, discharge, clean-up, and remediation of radiation and toxins at Treasure Island. That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted fake sampling tests to mislead the Plaintiffs and the public into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

**(NEGLIGENCE FEAR OF CANCER)**

**(TETRA TECH EC, INC.; SHAW ENVIRONMENTAL INC. and DOES 1-100)**

105. PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs 1-104, as though fully set forth herein.

**106.** That Plaintiffs were exposed to radiation, carcinogens and other toxic substances, as a result of Defendants' **TETRA TECH EC, INC.** negligent conduct for failing to disclose to the Plaintiffs and the public the true levels of radioactivity on Treasure Island; That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted fake sampling tests to mislead the Plaintiffs into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

**107.** That Plaintiffs were exposed to radiation, carcinogens and other toxic substances, as a result of Defendants' **SHAW ENVIRONMENTAL INC.** negligent conduct for failing to disclose to the Plaintiffs and the public the true levels of radioactivity on Treasure Island; That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted fake sampling tests to mislead the Plaintiffs into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

108. That the Defendants' conduct was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of the Plaintiffs' rights;

109. That Defendants intentionally misrepresented or concealed a material fact known to the Defendants, intending to cause Plaintiffs harm;

110. That the Plaintiffs suffered serious emotional distress from a fear that they will develop cancer as a result of the exposure;

111. That reliable medical or scientific opinion confirms that the Plaintiffs' risk of developing cancer, was significantly increased by the exposure and has resulted in an actual risk that is significant; and

112. That the Defendants' conduct was a substantial factor in causing Plaintiffs' serious emotional distress.

113. DEFENDANTS acted with malice or oppression, or fraudulent or intent in exposing Plaintiffs to carcinogens and toxic substances, and that this conduct caused Plaintiffs to suffer serious emotional distress.

## (STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES)

## (Against SHAW ENVIRONMENTAL, TETRA TECH EC, INC. and DOES 1-100)

114. PLAINTIFFS and class members hereby incorporate allegations contained in the pre ceding paragraphs, as though fully set forth herein.

115. DEFENDANTS **SHAW ENVIRONMENTAL** engaged in an ultra-hazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages. That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted fake sampling tests to mislead the Plaintiffs into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

116. DEFENDANTS **TETRA TECH EC, INC** engaged in an ultra-hazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages. That these Defendants were aware that the levels of radiation on Treasure Island were significantly higher than the Navy disclosed to the public and that these Defendants intentionally chose not to disclose this information to the Plaintiffs. Further, it is alleged that these Defendants conducted

fake sampling tests to mislead the Plaintiffs into believing that the radiation levels on Treasure Island were not as high as they actually were in deliberate fabrication of the truth and that they failed to properly perform radiological clean up of the soil surrounding and under the Plaintiffs' residences.

117. These named DEFENDANTS, are responsible for the harm, injuries, damages, both economic and noneconomic because DEFENDANTS engaged in remediation of nuclear waste, radioactive materials, an ultra-hazardous activity at Treasure Island.

118. PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at Treasure Island.

119. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

120. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including

loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

121. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

## (VIOLATION OF PROPOSITION 65)

**(Against SHAW ENVIRONMENTAL, TETRA TECH EC, INC.; and DOES 1-100)**

122. PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

123. Proposition 65 California Health and Safety Code sections 25249.5 - 25249.13 imposes: "Prohibition on Contaminating Drinking Water with Chemicals Known to Cause Cancer or Reproductive Toxicity.

124. That Proposition 65 Section 25249.6 required the Defendants to disclose and warn the Plaintiffs of the exposure to chemicals known to cause cancer or reproductive toxicity.

125. That since at least 2004, all DEFENDANTS breached this duty when they failed to comply with Proposition 65 by failing to notify Treasure Island Plaintiffs that they were releasing radioactive materials in the air, and by failing to give warning that DEFENDANTS were leaving, covering over, paving under, and covering up radioactive materials on the grounds of Treasure Island.

126. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

127. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

## (PUBLIC NUISANCE)

### (Against SHAW ENVIRONMENTAL, TETRA TECH EC, INC.; and DOES 1-100)

128. PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs 1-127 as though fully set forth herein.

129. These named DEFENDANTS, engaged in negligent, reckless, intentional, and criminal conduct by deliberately and premeditatedly leaving and placing radioactive soil on Treasure Island, fully aware that dust, debris, and radionuclides would blow with the prevailing winds over the Treasure Island Community and cause life threatening permanent injuries and death.

130. Plaintiffs suffered harm because DEFENDANTS created a nuisance. DEFENDANTS, by leaving radioactive materials and other toxins on Treasure Island, created conditions that were harmful and injurious to health and life; were offensive to the senses; were

an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to Treasure Island by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the Plaintiffs have to breathe.

131. Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in failing to disclose that they left radioactive soil in the densely populated residential community.

132. DEFENDANTS' conduct was a substantial factor in causing the Plaintiffs' injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries.

133. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

**(PRIVATE NUISANCE)**

**(Against SHAW ENVIRONMENTAL, TETRA TECH EC, INC. and DOES 1-100)**

134. PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs 1-133, as though fully set forth herein.

135. DEFENDANTS interfered with the Plaintiffs' use and enjoyment of their land by acting or failing to act as hereinabove described, by leaving radioactive materials and other toxins on Treasure Island.

136. Based on their conduct, the Defendants created conditions that were harmful and injurious to health and life; were offensive to the senses; were an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to the Plaintiffs' property by contaminating ground water, soil for vegetation, lawns, and the quality of the air that they had to breath.

137. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

138. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS pray judgment against DEFENDANTS as follows:

1. For an order requiring DEFENDANTS to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action;

2. For a preliminary injunction, enjoining DEFENDANTS, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them to:

   a. Take "anticipatory action" to prevent harm and through exploration of current toxicity and careful analysis of courses of action in order to present the least threat to residents on Treasure Island and;

   b. Conduct an immediate Health and Safety assessment for residents, workers and students on Treasure Island.

3. DEFENDANTS, and each of them, must be ordered to STOP ALL DEVELOPMENT, CONSTRUCTION, BUILDING, DIGGING, ERECTING, DISTURBING THE SOIL, DIRT, EARTH, BUILDINGS, STRUCTURES, PIPES, AND ALL ACTIVITY AT TREASURE ISLAND UNTIL INDEPENDENT VERIFIED REPORTS CAN BE OBTAINED SHOWING COMPLETE AND TOTAL REMEDIATION OF ALL TOXIC SUBSTANCES, INCLUDING ALL RADIOACTIVE MATERIALS FROM Treasure Island;

4. Monetary damages in the amount of $2 billion dollars,

5. For costs of suit incurred in this action; and

6. For such other and further relief as the Court deems proper.

34

7. For an order certifying the Class, appointing PLAINTIFFS and their counsel to represent the Class, and notice to the Class to be paid by DEFENDANTS;

8. For an order requiring DEFENDANTS to immediately pay for medical screenings for early detection of any radiation related medical conditions.


Date: February 15, 2021

LAW OFFICE OF STANLEY GOFF

_____/s/ STANLEY GOFF_____
STANLEY GOFF
Attorney for Plaintiffs
